## Clark et al. v. Commonwealth.

(Decided Oct. 1, 1937.)

834

.E. SELBY WIGGINS and O. P. JACKSON for appellants.

HUBERT MEREDITH, Attorney General, and JOSEPH ZIEG-LER, Jr., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellants, Hershel Clark and Lino Tevis, with one Henry Watts, were jointly indicted by the Madison grand jury for committing the offense denounced by section 1160 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes, i. e., maliciously assaulting another with intent to rob or to demand of him money or other property by force and violence and with deadly weapons. The alleged victim was Clarence Willis, a clerk in the Bogie Brothers store at Ruthton, in Madison county, Kentucky, which is located some miles from the city of Richmond. The indictment in its first count charged the three as principals and that they jointly committed the offense; but in the second count it charged Watts as principal and the two appellants as aiders and abettors. Watts entered a plea of guilty to the indictment, and the jury punished him with the minimum punishment of

confinement in the penitentiary for twenty-one years. The other two defendants in the indictment, who are appellants here, entered a plea of not guilty; but upon their trial before a jury they were convicted as aiders and abettors of Watts and were each given the same punishment. Their motions for a new trial were overruled, and they prosecute this appeal from the verdict and the judgment rendered thereon. Their counsel urge as grounds for reversal: (1) Insufficiency of the testimony to sustain the conviction; (2) improper admission of confessions and admissions made by defendants to officers after their arrests; and (3) failure of the court to give instruction A offered by defendants' counsel—each of which will be disposed of in the order named.

1. The offense was committed between 4:00 and 4:30 o'clock in the afternoon on January 23, 1937. Each of the accused lived in the city of Richmond, and Watts and Clark had each served terms in the penitentiary prior thereto; but those facts went only to their credibility as witnesses. Tevis was at the time working for a Mr. Evans and part of his services was the driving of a truck belonging to his employer. In the earlier part of the day he took possession of the truck, but instead of returning it when his services therewith were performed, he used it for his own purposes and carried it to the home of his father with whom he resided, and which was located in the city of Richmond. The commonwealth proved that a short while before the commission of the offense—which was done by Watts alone—the three were seen in the truck going in the direction of the store that was attempted to be looted. They were also seen at various points along the route from Richmond to the final destination, and likewise seen on the return trip. It was also proven by the commonwealth that after leaving the scene, and following the unsuccessful effort of Watts to procure money from Willis, the clerk, Clark, got out of the truck and left it, traveling afoot over unfrequented routes, a part of which trip, as he later explained, being made in a truck in which its friendly driver permitted him to ride. The other two returned to Richmond in the truck, but partially, if not entirely, over a different route than had been traveled in going to the store.

When the parties arrived in the immediate vicinity

of the robbed or attempted to be robbed store, the truck was driven beyond it, at which place Watts got out of it and carried along with him, as he went in the direction of the store, a shotgun that the parties had procured from the home of the father of Tevis, where the latter was, as we have said, residing. They explained that they carried the gun along with the possibility of encountering some rabbits on their trip, but in which they appear to have been disappointed. While Watts was out of the truck in the immediate vicinity of the store, and while he was in the store, the truck was turned round and headed back towards Richmond and its inmates (the two appellants here) maneuvered it by moving forward short distances and then stopping, and which process was repeated until Watts approached it—after his mission of robbery had failed—bringing only the stock of the gun that he had carried into the store.

It was proven by Willis and his brother (the only two other persons who were in the store) that Watts came in and asked for some cheese, or some bologna sausage—neither of which was in the store—and he then called for some cakes, when Curtis Willis, the clerk, got a package of cakes and placed it upon the counter. Watts then raised his gun with the hammer cocked and said, "Give up what you have got, or your life," and upon that statement being made Willis' brother rushed in and grabbed the gun by the barrel. In the scuffle over its possession it was broken in two at the breech—the brother holding its barrel and Watts its stock. At that point the latter made his escape from the store and went to and got into the truck, which was then, possibly, 270 yards from the store; the hesitating movements of it having carried it that far while Watts was in the store.

The officers stated that Clark said after he was arrested that he went along with the crowd to get some whisky that Watts had told him was available in that vicinity; but no one throughout the trial named the person from whom the whisky was expected to be obtained. The officers also testified to an admission or confession by Tevis that Watts told him, when application was made for the use of the truck, that he wanted to go into the country to get some money which he knew was deposited at some place and that he would give Tevis $50 to go along and drive the truck, which was a certain

amount that Tevis was to receive; but he further stated to the officers that his compensation might probably be $700 or $800.

In the first statement Tevis made to the officers, he denied any participation in the matter whatever, saying that he was in Richmond all the afternoon of that day. He later admitted, and did so on the stand, that he did make the trip as proven by the commonwealth, and that Watts agreed to pay him $50 therefor out of the money that he expected to obtain at some hidden place which was unknown to Tevis. Clark also admitted his participation as described, but he claimed utter ignorance as to the purpose of the trip other than the procurement of whisky. Under the circumstances we think this ground is not available to appellants. The case for the commonwealth, especially as to Clark, at the time of the close of its testimony was greatly strengthened by the defendants themselves in their testimony, and there would have been much more room for the urging of this ground as to the appellant Clark if he had rested his case at that juncture of the trial. But it is a universal rule that parties litigant, including defendants in criminal prosecutions, may strengthen the case against them by taking the stand and to thereby cure any weakness in the proof for their adversaries. We do not mean to intimate that the commonwealth's evidence as to either of the appellants was of such a nature as to require an instruction of acquittal for either of them, but only to say that the probative value of its proof was greatly strengthened against each of them by and through the introduction of their testimony. We do not conclude that the court erred in overruling appellants' motion for a peremptory instruction of acquittal. See Jackson v. Commonwealth, 265 Ky. 458, 97 S. W. (2d) 21.

But it is argued that under the rule announced in the case of Shelton v. Commonwealth, 261 Ky. 18, 86 S. W. (2d) 1054, the motion of appellants for a directed acquittal should have been sustained, since they were convicted only as aiders and abettors of Watts, when the proof showed that they were between two and three hundred yards from the store at the time Watts was committing the offense in it. There is a fundamental distinction between the facts of the Shelton Case and those in this one. Shelton, it was proven, was thirty

miles away from the scene of the offense there involved, and he was in no position to render any immediate assistance to the actual perpetrator. Moreover, the principal was not indicted with Shelton in that case, but the indictment against him was an independent and separate one in which he was charged only as an aider and abettor. Here, both appellants, while not in the immediate presence of Watts, were at least constructively so and where they might watch and protect, and were equipped with a vehicle so as to hurriedly and possibly safely escape after the offense was committed. They were sufficiently near to the scene to render such aid and assistance, and if this prosecution depended upon the requirement that the presence of appellants within the contemplation of that which is necessary to create one an aider and abettor, we have no hesitancy in concluding that such presence existed in this case. See the Jackson case, supra. It would be no difficult undertaking to cite a number of cases upon both of the stated legal propositions, but to do so would unnecessarily lengthen the opinion and would add nothing to their certainty, since all courts speaking upon the subject approve them. We will, however, direct attention to the text on "Constructive Presence," sufficient to render one an aider and abettor, as found in 16 C. J. pp. 126 and 127, wherein the compiler thereof thus states the general principle: "The presence at the place and time of the crime required to make one a principal in the second degree, or an aider and abettor, may be constructive, as where one, acting with another in the pursuance of a criminal design, is so situated when the crime is committed as to be able to assist in its commission," and, "A very common instance of a constructive presence is where one at a distance from the scene of the felony keeps watch in order to give warning of the approach of danger so as to facilitate the escape of the actual perpetrators of the crime." Those excerpts are supported by many cases cited in the notes, some of which are from this court.

2. The reason urged in support of ground 2 is that the introduced confessions or admissions of appellants violated what is known as our "Anti-Sweating Act." Ky. Sts. sec. 1649b-1 et seq. But we have frequently held in construing that statute that a confession made without threats, duress, or any other circumstances rendering it involuntary in the least, was admissible against

the one who made it, notwithstanding it was made to an officer after the confessor had been placed under arrest. There is not the slightest intimation in this case—not even by either of the defendants—that any officer did anything whatever to influence the proven statements by either of appellants. On the contrary, it was expressly shown that nothing of the sort happened. We, therefore, conclude that this ground is wholly without merit.

3. The complaint made under ground 3 is that the court erred in refusing an instruction marked "A" offered by appellants; but we have searched the transcript in vain to find any such instruction, unless the offered peremptory one was prepared and so designated, though no such facts appear from the transcript. It is intimated in briefs that possibly that instruction embodied a submission of appellants' guilt of a lesser degree of the statutory offense, i. e., that of aider and abettor to an assault without any intent to rob. But we can proceed with a determination of that question only upon a surmise basis in the absence of the instruction iself. But, if the evidence was of such a nature as to require the giving of that instruction, defendants would be entitled to avail themselves of the failure of the court to do so, under the rule that it is the duty of the court to give the whole law of the case. However, our interpretation of the testimony, after giving it most careful consideration, is that there was no room for any such instruction, since the facts show that the offense attempted to be committed by Watts was clearly within the purview of the statute whereby the commission of a felony, therein described and created, was committed. It being the rule that instructions are based upon evidence, and that no issue should be submitted in the absence of evidence to support it, the court did not err in or failing to instruct the jury.

The entire circumstances of the case are most convincing to any fair and impartial mind that all of the defendants made the trip to the Bogie Brothers store on that day for the purpose of robbing it; that they were in concert; and that the money that Watts spoke of before the trip was entered upon, and for the possession of which they allegedly made the trip, was clearly the money that might be found at or in that store when robbed by them. Society is safer and offenders of the

kind here involved are serving their country better when incarcerated in prison than when they are permitted to run at large. We unhesitatingly conclude that the jury in this case elected appellants to become dwellers in the penitentiary—positions for which they clearly became candidates when they embarked on the unlawful enterprise of that fatal afternoon to them. Civilized and orderly conducted society has no other place for those who "seek where they have not sown."

Finding no sufficient ground to reverse the judgment, it is affirmed.